UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-20244-CR-GAYLES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FREDERICK LEE ALVIN,

      Defendant.

_____/

**REPORT AND RECOMMENDATIONS ON
DEFENDANT'S MOTION TO SUPPRESS DNA EVIDENCE**

A federal grand jury indicted Defendant Frederick Lee Alvin ("Alvin" or "Defendant") on four counts arising from his alleged possession (as a convicted felon) of a firearm during a Hobbs Act robbery. Alvin filed a Motion to Suppress DNA Evidence. The United States filed a response, Alvin filed a reply, the United States filed a Notice of Supplemental Authority, Judge Gayles referred the motion to the Undersigned and I held a one-and-a-half-hour evidentiary hearing. [ECF Nos. 108, 114, 130, 161, 165].

This procedural history generated two primary issues: (1) did Chief Magistrate Judge Edwin G. Torres have probable cause to issue a warrant for the collection of DNA (through two cotton swabs taken from the inside of Alvin's mouth) so that police DNA

experts could compare it to any usable DNA from a firearm seized by police during their arrest of Alvin when the affidavit failed to include any information that usable DNA had already actually been found on the firearm? and (2) assuming that the warrant was invalid because probable cause was lacking without a showing that usable amounts of DNA were found on the weapon, can law enforcement officers rely on the so-called "good faith" doctrine created by the Judge's issuance of the warrant, which would then preclude suppression even though the warrant was incorrectly issued?

All parties agree that there is no binding law answering the first issue and that there is only limited non-binding case law, some of it from this District and most of it from other districts -- but that the overall legal landscape is conflicting. The first issue is thorny and unsettled, but the Undersigned need not grapple with that legal dilemma. That's because the good faith exception applies here, rendering the first issue academic. Therefore, the Undersigned **respectfully recommends** that Judge Gayles **deny** the motion.

## Factual Background

For purposes of this motion, Alvin does not challenge the underlying factual background presented by the United States in its response. His challenge is legal, and it focuses on the United States' failure to first confirm that the firearm in question even had any usable DNA on it before asking a judge to issue a warrant for Alvin's DNA. Alvin's legal argument is straightforward: if there is no usable DNA on the firearm, then

retrieving his DNA is unnecessary because there is nothing to compare his DNA to, and the warrant is defective because the place to be "searched" (i.e., his mouth) will not contain any evidence.

The United States provided the following scenario:

On April 3, 2022, the Defendant entered the B & J Market in the Little Havana neighborhood of Miami, Florida wearing a black mask, pulled out a handgun, and threatened to shoot the cashier if he failed to give him all the money in the register. The Defendant discharged his gun once into the floorboard and then took about $3,000 from the store register and several hundred more from the cashier's wallet before leaving the store on foot with the firearm. A search warrant for the Defendant's residence turned up a loaded magazine containing the same type of bullets as the one the Defendant fired at the B & J Market, as well as the same green Nike Ken Griffey Jr. Air Max 1 athletic shoes worn by the robber.

Slightly more than a month later, on May 8, 2022, officers responded to the Little River Hotel in Miami upon reports of an armed assault and robbery in progress. When they arrived, they found the Defendant barricaded into a previously-vacant hotel room on the ground floor. The hotel's owner, who was working in the lobby at the time, told law enforcement that a man matching the Defendant's description entered the hotel with a gun and began knocking on various rooms of the hotel, including one near the

unoccupied lobby. When the owner called the police, the Defendant walked over to the owner in the lobby of the hotel and fired the gun at his midsection.

Police officers, law enforcement negotiators, and eventually S.W.A.T. officers tried to get the Defendant to exit the room peacefully. Law enforcement officers saw a gun lying on the floor of the room through the large window facing the front of the hotel. After several hours, the Defendant exited the hotel without the gun and was arrested.

A crime scene investigator collected the gun from inside the hotel room -- a Taurus, Model PT111 G2, 9mm caliber semi-automatic pistol -- and one fired casing from the hotel lobby floor. Inside the firearm was an additional fired casing in the chamber, as well as one live round of ammunition inside the gun's magazine.

The crime scene investigator swabbed the Taurus firearm for DNA in three locations: (1) the trigger; (2) the exterior surface of the frame, slide, grip, and hammer; and (3) the extended Promag magazine loaded into the firearm. The live ammunition and casings found at the hotel were from the same type of ammunition as the fired casing recovered at the B & J Market and in the magazine from Alvin's residence. A firearm examiner later compared the fired casings from the two robberies and determined that the Taurus firearm possessed by the Defendant at the hotel was the same gun used in the convenience store robbery.

On November 22, 2022, Task Force Officer ("TFO") Carlos Calzadilla, a City of Miami Police robbery detective assigned to the Bureau of Alcohol, Tobacco, Firearms,

and Explosives, applied for a warrant to take two oral cotton swabs from inside the

Defendant's mouth for DNA analysis and comparison. That same day, Judge Torres

signed a warrant under Case No. 22-mj-03990 authorizing the Government to collect the

Defendant's DNA. A few days later, TFO Calzadilla swabbed the Defendant for DNA at

the Federal Detention Center in Miami with the Defendant's counsel present.

In his affidavit in support of the warrant application, TFO Calzadilla summarized

the evidence linking the Defendant to the offenses of Hobbs Act robbery, discharge of a

firearm in furtherance of a crime of violence, and felon in possession of a firearm on April

3, 2022, noting that Alvin had been indicted on those charges by a federal grand jury and

also made the following statements under-oath:

> • "Law enforcement subsequently took swabs from the firearm
> recovered from Alvin at the Little River Hotel to collect DNA." (*Id*. ¶ 14);

> • "Based on my training and experience, I know that DNA can be
> left on items and evidence when those items come in contact with human
> skin, sweat, blood, or other bodily fluids. This occurs intentionally or
> unintentionally when a person's cellular material transfers through
> touching or depositing of bodily fluid on an item. The more cells a person
> transfers to an object, the greater the likelihood that sufficient cellular
> material is present for DNA analysis. Normally, a person does not transfer
> just one cell in the normal course during this process. Therefore, it is
> reasonable to believe, and **more likely than not**, that a human being has
> deposited a cell or cells containing a DNA molecule in the normal course of
> coming into contact with an item. This would include the firearm in Alvin's
> possession on April 3, 2022, when he robbed the B & J [M]arket, as well as
> the same firearm in Alvin's possession on May 8, 2022, when he robbed the
> Little River Hotel. The Second Superseding Indictment charges Alvin with
> possession of a firearm and ammunition by a convicted felon as a
> continuing offense from April 3, 2022 through May 8, 2022 (Count 4). As
> mentioned above, a Nibin test shows that the gun fired at the B & J Market

5

on April 3, 2022 is the same firearm as the one possessed by Alvin on May 8, 2022." (*Id*. ¶ 16);

• "Based on these facts, there is probable cause to believe that ALVIN possessed the firearm. Therefore, it is **reasonable to believe** and **likely** that ALVIN'S DNA was deposited on the firearm." (*Id*. ¶ 14); and

• "The DNA analysis and comparison will be performed by the Miami-Dade Police Department Crime Laboratory or a lab that contracts with Miami-Dade Police Crime Laboratory. The lab will examine the submitted standard against any genetic material recovered from the firearm (*Id*. ¶ 18).

(emphasis added).

On December 8, 2022, Evelyn Perez, a DNA analyst with the Miami-Dade Police Department, examined the three evidence samples from the firearm swabbed by the crime scene investigator and compared them to the DNA standards taken from the Defendant pursuant to the warrant. Ms. Perez wrote a report of her findings on December 13, which was produced to the Defendant's counsel along with all the report's supporting notes, charts, and inventories.

Ms. Perez reached three conclusions, which she will testify to at trial: (1) the swab of the firearm's trigger contained a mixture of four individuals' DNA, the major component of that mixture matched the Defendant's DNA standard at 20 of 21 loci, and the likelihood of finding this DNA profile in an unrelated individual in the population at large is 1 in 162.3 octillion; (2) the swab of the firearm's frame, slide, grip, and hammer contained a mixture of two individuals' DNA, the major component of that mixture matched the Defendant's DNA standard at 20 of 21 loci, and the likelihood of finding this

DNA profile in an unrelated individual in the population at large is 1 in 162.3 octillion; and (3) the swab of the firearm's magazine contained a male DNA profile, that DNA profile matched the Defendant's DNA standard at 21 of 21 loci, and the likelihood of finding this DNA profile in an unrelated individual in the population at large is 1 in 1.131 nonillion.

**The Evidentiary Hearing**

TFO Calzadilla is the only witness who testified at the evidentiary hearing. This summary will primarily outline only those portions of his testimony relating to the two issues mentioned at the beginning of this ruling.

He had not tested the swabs from the firearm to see if there was usable DNA on them. Nobody in law enforcement checked to see if usable DNA was on the seized firearm.

TFO Calzadilla said the Miami-Dade County Crime Lab would *reject* a swab if there was no standard submitted.

TFO Calzadilla submitted approximately 20 affidavits for DNA in his 10-year career as a law enforcement officer. Of those, he never asked the lab to first test the gun to see if there was a usable sample on it.

According to TFO Calzadilla, he has heard that the lab rejects requests for DNA comparison if *both* the item (e.g., a firearm) and the suspect's DNA sample are not

submitted. He personally has never received a rejection, but lab employees have explained to him that no processing would be done if a rejection were issued.

TFO Calzadilla said he does not know the law concerning rejections and has not seen anything in writing about the lab's rejection policy.

TFO Calzadilla said he is not sure why the lab has the rejection policy.

He noted that he has submitted more than five DNA warrant applications to federal magistrate judges and never alleged in the affidavits that he or other officers or law enforcement personnel had established that there was, in fact, usable DNA available before requesting the warrant, nor did he discuss that the lab needed to first establish the existence of usable DNA before seeking to compare the samples.

TFO Calzadilla also said that he is not aware of any case law requiring confirmation of usable DNA samples before seeking a warrant. He did not know of any legal authority on this point **either way** (i.e., permitting or forbidding the lab to proceed, without confirmation about usable DNA being present).

TFO Calzadilla said he believed that Judge Torres had the legal authority to issue the DNA warrant without first establishing that usable DNA had been retrieved from the firearm in a sufficient amount. He further explained his understanding that other law enforcement officers follow the same procedure for obtaining DNA warrants.

During cross-examination, he said that written standard operating procedures do not say anything about the timing of seeking a DNA warrant and any efforts to confirm

8

if usable DNA existed in sufficient amounts to permit a technician to make the comparison.

**The Parties' Additional Contentions**

Alvin argues that the United States is seeking to uphold its practice of submitting DNA warrant applications without first confirming the existence of usable DNA in order to promote the lab's mere *preference* for its no-confirmation-first procedure. He notes the absence of any written rules, procedures or guidelines explaining why the no-confirmation policy is *necessary*, as opposed to being an informal preference.

Alvin argues that the lab's preference is not necessary, and he points to a case from this District where the prosecutor advised that the lab insisted that its rejection policy be followed but that the United States then instructed the lab to first establish the presence of usable DNA -- and the lab complied, demonstrating that it is certainly *possible* for the lab to first confirm if usable DNA is present before the agent seeks a warrant for a DNA swab from the suspect.

The United States emphasized its view that probable cause was established because of what it deemed the affidavit's specific allegations (as opposed to a "barebones" affidavit) that Alvin handled the firearm in a way suggesting the presence of his DNA on the firearm. The United States also argued that four non-binding district court cases cannot be sufficient to vitiate the officer's good faith in relying on a warrant. It recognized the split of authority but noted that the majority of the district courts either

concluded that probable cause did not require the confirmation of usable DNA as a prerequisite to obtaining a DNA warrant or that the officers relied on the warrant in good faith. On a related point, the United States argued that "great deference" should be afforded to the magistrate judge's probable cause determination.

**Applicable Legal Standards and Analysis**

Probable Cause

Probable cause is simply a reasonable ground for belief amounting to less than a prima facie case but more than mere suspicion. *United States v. $242,484.00,* 389 F.3d 1149, 1160 (11th Cir. 2004) (*en banc*). To determine whether a warrant was based on probable cause, a reviewing court must make only a practical determination based on a totality of the circumstances whether there is a "fair probability" that evidence of a crime will be found at the premises to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994); *see also Gates*, 462 U.S. at 236 (holding that reviewing courts must pay "great deference" to the issuing judge's determination of probable cause) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

10

The Supreme Court has repeatedly stated that the review "process does not deal with hard certainties, but with probabilities . . . .[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates*, 462 U.S. at 231–32 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Alvin's motion primarily relies on three cases (two are magistrate judge opinions -- one of them issued by the Undersigned -- and one is a district court ruling) to support his argument that the Government was required to allege in the warrant affidavit that "a DNA profile recovered from evidentiary DNA swabs is of a sufficient quality to be used for comparison purposes with the DNA the [G]overnment seeks to obtain from" the Defendant to establish probable cause. [ECF No. 108, p. 3]. The Undersigned will discuss each and will include the reasons why the United States deems the authority distinguishable.

First, *United States v. Marshall*, No 11-CR-00381, 2012 WL 2994020 (W.D.N.Y. July 20, 2012). In *Marshall*, the United States filed a motion for an order authorizing the taking of a DNA sample from in-custody defendants through the use of buccal swabs. Those samples were to be compared against three seized firearms submitted to a police laboratory for testing. Those tests established that all three weapons contained DNA from unknown individuals. The defendants (other than one of the five) were all indicted for, among other charges, possession of firearms in furtherance of drug trafficking crimes.

11

Significantly, the United States alleged that "known buccal samples are required for further comparison because the mixture profile [for each firearm] is not suitable for entry into the CODIS databank."

The magistrate judge agreed with the defendants that the return of an indictment does not in and of itself establish the Government's entitlement to compel a DNA sample. However, the judge concluded that, to the extent the grand jury found probable cause that the four defendants possessed firearms, there is reasonable suspicion to believe that their DNA will be found on the firearms. But, the judge also concluded that "this is not the end of the inquiry" because of the questionable quality of the DNA mixture samples.

Therefore, the judge held, "without evidence that the DNA samples recovered from the firearms are of a sufficient quality to be used for comparison purposes with the DNA the [G]overnment seeks to obtain from the defendants, there is nothing to suggest that compelling [the] defendants' DNA will lead to probative evidence in this case." *Id.* at *3. He also noted that the Government "inexplicably failed" to submit an affidavit offering an "explanation for why the samples would not be suitable for entry into CODIS, yet be sufficient to permit the Police Lab to determine whether the samples are a match to the DNA the [G]overnment seeks to compel from the defendants." *Id.* The judge denied the motion without prejudice.

The United States noted that the Government in *Marshall* wanted to take the DNA of one of the defendants not charged with a firearm offense. [ECF No. 114, p. 8]. While

12

correct, that point is not persuasive, as the Government also wanted to obtain DNA from the *other* four defendants, who *were* charged with a firearms offense.

The United States also points out that the Miami-Dade police laboratory "does not test evidence samples for the quantity or quality of DNA until it receives a DNA standard from a known source for comparison." *Id*. But this is not convincing. If the laboratory was using an unconstitutional procedure, then the mere fact that it *routinely* uses the unlawful procedure does not immunize the practice from scrutiny and judicial rejection. In addition, and for the same reason, the Government's argument that an order granting the suppression motion "would invalidate the procedure for all the county's law enforcement DNA testing" is also unconvincing. *Id*. Invalidation of the procedure may well be the result, but invalidation of an **unlawful** procedure used by a county lab does not mean that the practice should be *approved*. Indeed, if an appellate federal court branded the county's DNA lab procedure unlawful, one would hope that the county would not continue to use it anyway (in order to avoid the administrative consequences of adopting a different, and legal, procedure).

Second, *United States v. Castillo*, No. 16-20626, 2016 WL 6158133 (S.D. Fla. Oct. 24, 2016), an opinion I authored, did not arise from a motion to suppress. Instead, the factual scenario developed in a way which led to a pre-issuance briefing schedule and the defendant's filing of a motion to deny issuance of an oral swab warrant. In that ruling, the Undersigned noted that *Maryland v. King*, 133 S. Ct. 1958, 1980 (2013) authorizes the

Government to obtain DNA from an arrestee if that procedure was part of a routine booking arrest. *Castillo* also pointed out that taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing the defendant, a legitimate police booking procedure.

However, *Castillo* highlighted the fact that the DNA portion of the booking procedure in *Maryland v King* was pursuant to the Maryland DNA Collection Act, which limits how the information obtained from the swabbing may be used. No purpose other than identification is permissible under that Maryland law. Identification was not the purpose of the DNA swab in *Castillo* and it is not the purpose of the warrant-authorized swab here either.

To the contrary, the basis of the warrant unsuccessfully requested in *Castillo* (and of the one successfully obtained here) is the Government's contention that there is probable cause to believe that the DNA obtained from the defendants will yield relevant evidence. In *Castillo*, the Undersigned explained that there was no doubt that there was probable cause to believe that Castillo unlawfully possessed a firearm as a convicted felon. But that was not enough to justify a DNA buccal swab because "there can be no comparison if there is no usable DNA found on these items." 2016 WL 6158133, at *3.

Relying on *Marshall*, which I found to be persuasive, the Undersigned viewed the warrant request in *Castillo* as **premature** and provided the United States with two alternatives: (1) it could resubmit the affidavit and proposed warrant by making the

warrant *conditional* on first obtaining usable DNA from the items, or (2) it could wait to obtain confirmation that usable DNA exists and *then* resubmit the warrant package. The docket does not expressly disclose whether the United States selected one of the alternatives, but it does reveal that Castillo had a change of plea hearing on November 14, 2016, approximately three weeks after the Order granting his motion to deny the issuance of the oral swab warrant was entered.

The United States argued, in its opposition that *Castillo* (and the other two cases discussed here) should not be followed because "the bases for their conclusions are incorrect, distinguishable, and not binding." [ECF No. 114, p. 2]. Although it discussed *Marshall* and *United States v. Jennings*, No. 21-cr-60193, 2021 WL 523592 (S.D. Fla. Nov. 9, 2021), it did not attempt to distinguish *Castillo.* Instead, it implicitly referenced *Castillo* by arguing that the warrant application here was supported by ample probable cause and then citing to cases which either criticized *Castillo*, *Marshall*, and *Jennings* or held that probable cause supported a DNA buccal swab absent proof that viable DNA exists on the item to which the buccal swab was to be compared.

The United States highlights several facts to support its theory that probable cause for the DNA swab of Alvin exists. The warrant alleged significant facts linking the Defendant to several crimes involving the possession and use of a particular firearm, that the Defendant had been indicted for crimes that involved the use of that firearm, that the Defendant had possessed the firearm on a continuing basis between the two criminal

15

events, and that ballistics evidence showed that the gun taken from the Defendant on May 8 was the same one used in the April 3 robbery. Moreover, the warrant affidavit made specific allegations about the likelihood that DNA would be left on a firearm given the Defendant's **continuous possession** of the gun over at least five weeks and that law enforcement had swabbed the gun for DNA. Under these circumstances, the United States posited, there was a "fair probability" that the Government would obtain probative evidence from the Defendant's DNA, as indeed it ultimately did. *Id.* at 9.

Third, *Jennings* involved a warrant issued by a magistrate judge to collect Defendant's DNA based on an affidavit which did not disclose whether the swabbing of the firearm found in Defendant's vehicle resulted in the analysis of the DNA. Moreover, the affidavit did not disclose whether the DNA profile from the firearm was of sufficient quality for comparison.

The *Jennings* Court noted that the Federal Bureau of Investigation has stated, as a matter of procedure, that "the first step after discovering DNA in connection to a crime is to develop a profile based on the DNA from the evidence **before** collecting DNA samples from the defendant." 2021 WL 523592, at *8 (emphasis added). The Court there noted that, "contrary to FBI procedure," law enforcement did not first develop a profile from the DNA found on the firearm. Citing *Marshall* and *Castillo*, the *Jennings* Court held that there was no probable cause to believe that the DNA from the defendant would yield relevant evidence because the DNA sample from the firearm had not yet been analyzed.

[However, the *Jennings* Court ultimately denied the motion to suppress because of the good faith exception, a development I will discuss later in this ruling.].

In its opposition, the United States attempted to distinguish *Jennings* by contrasting the FBI's procedures with the practice of the Miami-Dade lab. [ECF No. 114, p. 8]. But that effort is not persuasive.

In *Jennings*, it was not the FBI that ran the DNA testing -- it was a <u>private lab</u> called DNA International.[1] Judge Bloom referred to the FBI's DNA procedures because they demonstrate that a defendant's DNA standard is not needed in order to determine whether there is DNA on a piece of evidence. It is not only possible but also consistent with best practices to *first* process the sample to develop a DNA profile. Contrary to the Government's assertion, the Miami-Dade lab is more than capable of following this procedure. *See, e.g., United States v. Daye*, No. 19-20547-cr-Cooke, DE 31 (Government's Response to Defendant's Motion in Opposition to Search Warrant) (S.D. Fla. Mar. 18, 2021) (noting that the defendant's motion in opposition to the DNA search warrant was moot because, after the motion was filed—but before the DNA warrant was executed— the Miami-Dade lab had conducted the necessary analysis to determine that the swab

---

[1]     The affidavit submitted to the magistrate judge in *Jennings* explained that DNA International is an accredited, independent DNA laboratory and that "the analysis from DNA international [sic] will assist the [G]overnment in proving identity and possession, based on a profile recovered from the swabs taken from the firearm recovered." [ECF No. 25-1, pp. 3-4].

from the firearm confirmed the presence of human DNA, and attaching an affidavit from the Miami Dade criminalist confirming the same).

So the Undersigned still views *Marshall, Castillo*, and *Jennings* as persuasive. However, I recognize that several other non-binding opinions disagree and that they criticize the reasoning of the three cases and held that probable cause supported a DNA buccal swab absent proof that viable DNA exists on the item to which the buccal swab was to be compared. *See United States v. Burkhalter*, No. 4:18-CR-00036-1-BCW, 2023 WL 2653388, at *5 (W.D. Mo. Mar. 27, 2023) ("[T]his Court does not believe that the Fourth Amendment requires the [G]overnment to confirm that the DNA swabs collected will yield a viable DNA sample before swabbing [D]efendant Burkhalter for DNA."); *United States v. Williams*, No. 17-cr-00238, 2019 U.S. Dist. LEXIS 154125, at *7–8 (M.D. Tenn. Sept. 10, 2019) ("The Court doubts that a warrant affidavit to obtain a buccal swab must allege the existence of a comparison sample that is of the right type or adequate quality to be used for comparison purposes, as [the] [d]efendant contends"); *United States v. Sedillo*, 297 F. Supp. 3d 1155, 1184 (D. N.M. Nov. 7, 2017) (upholding a DNA warrant that "lacks direct evidence that the United States will find testable DNA on the items, [but] contains circumstantial evidence to that effect"); *United States v. Lopez-Castillo*, No. 15-cr-279, 2016 U.S. Dist. LEXIS 54435, at *4 (D. Minn. Apr. 22, 2016) (finding the Supreme Court's ruling in *King*, 133 S. Ct. at 1968–69 that buccal swabs for DNA are minimally intrusive, especially for those already incarcerated with reduced expectations of privacy caused it

to reject the defendant's similar arguments about needing a testable sample pre-warrant); *United States v. Wilhere*, 89 F. Supp. 3d 915, 919 (E.D. Ky. 2015) (finding probable cause to take a defendant's DNA because "[the] [d]efendant is suspected of murder and . . . there **might** be DNA on the victim's body that could be compared to [the] [d]efendant's DNA") (emphasis added).[2]

The Undersigned is not convinced that the affidavit signed by TFO Calzadilla generates probable cause that it is "reasonable to believe and **likely** that Alvin's DNA was deposited on the firearm." [ECF No. 115, ¶ 17 (emphasis added)]. There is some research to indicate that there is a higher likelihood of obtaining a fingerprint from a gun than touch DNA -- but that the likelihood is still under 50%. Rock, K. (2016), Evaluating the Success of DNA Analysis and Latent Print Examinations on Submitted Firearms, Marshall University Forensic Science Research and Seminar https://www.marshall.edu/forensics/research-and-seminar/class-of-2017 (last visited

---

[2]    In its Notice of Supplemental Authority, the Government cited *United States v. Harrison*, 3:22-CR-455, 2023 U.S. Dist. LEXIS 129582, at *37–46 (N.D.N.Y. July 20, 2023) as a court which has "joined the small list of district courts to address this issue, rejecting the argument that the Government must test a firearm for DNA before obtaining a warrant." The court acknowledged that, "several magistrate judges in other judicial districts have expressed some interest in this timing question . . . these cases hardly justify suppression." *Id.* at *45. The magistrate judge issued the search warrant in that case, and the court, referencing *Castillo*, held that "[t]he fact that *other* magistrates in *other* judicial districts might have wanted to see a bit more from the search warrant affiant before signing off on a warrant does not vitiate the probable cause determination made in this case." *Id.* at *46 (emphasis in original).

December 14, 2023). If the rate is less than 50%, then it is not "likely" that Alvin's DNA would be found in usable quantities from the firearm swabs.

Given that the Miami-Dade crime lab could require officers to first submit the firearm for an analysis of whether it contains sufficient amounts of usable DNA before seeking a warrant for a buccal swab and further given that the FBI's best practices is to follow that procedure, the Undersigned is not inclined to change the analysis and conclusion I reached in *Castillo* (and which the judges in *Marshall* and *Jennings* also used). On the other hand, there are several non-binding cases reaching opposite conclusions and no binding authority to definitively guide the analysis to a logical and mandatory conclusion.

Therefore, in an abundance of caution, I will not take the final step and affirmatively conclude and hold that probable cause was lacking for the warrant issued by Chief Judge Torres **because the good faith doctrine saves the warrant either way.**

<u>Good Faith</u>

The exclusionary rule does not bar the use of evidence obtained by officers who act in good faith and reasonably rely on a search warrant issued by a neutral and detached magistrate judge when they properly execute that warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). This good faith exception to the exclusionary rule applies to all searches conducted except in four limited situations:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have

> known was false except for his reckless disregard of the truth; (2) where the
> issuing magistrate wholly abandoned his judicial role . . .; (3) where the
> affidavit supporting the warrant is so lacking in indicia of probable cause
> as to render official belief in its existence entirely unreasonable; and (4)
> where, depending upon the circumstances of the particular case, a warrant
> is so facially deficient - i.e., in failing to particularize the place to be searched
> or the things to be seized - that the executing officers cannot reasonably
> presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002).

Alvin does not contend that the first two scenarios apply. Instead, he suggests that the third (and possibly the fourth) circumstances apply. His reply does not pinpoint which specific situation he believes to apply, but argues that "good faith does not apply because it was not reasonable for law enforcement to rely on a warrant so lacking in probable cause." [ECF No. 130, p. 3].

Regardless of whether Alvin is seeking to invoke the third or fourth exception (or both), the Undersigned concludes that the good faith doctrine applies. *See Jennings*, 2021 WL 523592. *See also United States v. Williams*, No. 3:17-cr-00238, 2019 U.S. Dist. Lexis 154125, at *7-8 (M.D. Tenn. Sept. 10, 2019 ("the Court need not decide [the substantive probable cause issue], because even if the Court were to adopt Defendant's suggested interpretation of Fourth Amendment law as it pertains to warrants to obtain buccal swabs, the good-faith exception to the exclusionary rule defeats Defendant's motion. *See Leon*, 468 U.S. at 905.")).

The affidavit here is not barebones. To the contrary, it includes several paragraphs outlining facts tying Alvin to the firearm. Moreover, magistrate judges in this district

21

routinely authorize warrants for buccal swabs to be analyzed by the Miami-Dade crime lab and labs which contract with it. In fact, the affiant himself has successfully submitted DNA swab warrant applications without first establishing that the DNA to be compared exists in sufficient quantity and quality. Likewise, TFO Calzadilla has never heard of case law (such as *Castillo*) imposing such a requirement. To the contrary, his own experience and information he is familiar with about other officers' experience confirm that his reliance on the warrant without the confirm-the-DNA-on-the-firearm provision was reasonable.

Given these circumstances, the good faith doctrine applies, and the Undersigned **respectfully recommends** that Judge Gayles **deny** the motion to suppress DNA evidence.

<u>**Objections**</u>

The parties shall have five (5) days to file written objections, if any, with Judge Gayles and an additional five (5) days to file a response to the other party's objection.[3] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1);

---

[3]     The objection and response deadlines have been shortened because of the upcoming trial date and because the issues have been amply briefed. Any objections must be accompanied by a transcript of the evidentiary hearing held on the suppression motion.

*Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on December 15, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Darrin P. Gayles
All Counsel of Record