# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20244-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

FREDERICK LEE ALVIN,

    *Defendant*.

_____/

## REPORT AND RECOMMENDATION ON *DAUBERT* MOTION

This matter is before the Court on one remaining pending motion filed by Frederick Lee Alvin ("Defendant" or "Alvin"), who is accused of robbing a convenience store at gun point on April 3, 2022. Defendant moves to exclude ballistics evidence that matches bullet casings and the gun recovered during his arrest to a bullet casing found at the scene of the charged robbery on April 3. [D.E. 109]. An evidentiary hearing was held on the motion on January 4, 2024. The motion is thus ripe for disposition.[1] After careful consideration of the motion, the record, the relevant authorities, and for the reasons discussed below, Defendant's motion to exclude expert testimony should be **DENIED**.

---

[1] On October 10, 2023, the Honorable Darrin P. Gayles referred this and other motions to the undersigned Magistrate Judge. [D.E. 43].

## I.   BACKGROUND

The Second Superseding Indictment charges Mr. Alvin with four criminal counts stemming from his alleged involvement in the armed robbery of a convenience store on April 3, 2022. [D.E. 43]. According to the Government, on that date, Mr. Alvin entered the B & J Market in the Little Havana neighborhood of Miami wearing a black mask. Once in the store, he proceeded to pull out a handgun and threaten to shoot the cashier if he did not to give him the money in the register. [D.E. 52 at 3]. Mr. Alvin fired a single shot into the floor and took approximately $3,000 from the store register in cash before fleeing the store on foot. *Id.* Security footage from inside the market depicts the masked robber wearing a distinct black and gold "G-shock" watch, as well as a distinct pair of Nike sneaker shoes. *Id.* at 4.

Investigative efforts by law enforcement led to the identification of Luther Henry, Mr. Alvin's co-defendant and alleged accomplice in the market robbery.[2] Analysis of Mr. Henry's phone data revealed that the two of them spoke to each other immediately before and after the robbery, and pinpointed their location near the closest cell tower to the market during the robbery. *Id.* A subsequent search warrant for Mr. Alvin's residence uncovered a loaded magazine containing the same type of bullets as the one fired at the market, as well as the same green Nike Ken Griffey Jr. Air Max 1 athletic shoes worn by the suspect during the robbery. *Id.*

---

[2] Mr. Henry has pled guilty to one count of conspiracy to commit Hobbs Act robbery and has agreed to cooperate with the Government. [D.E. 64 ¶¶ 1, 8].

Mr. Alvin, however, was arrested during a different incident. On May 8, 2022, police officers responded to reports of an armed assault and robbery at a hotel in the Little River neighborhood of Miami. According to the owner of the hotel, Mr. Alvin entered the hotel with a gun and began knocking on various rooms. When the owner called the police, Mr. Alvin walked over to him in the lobby and fired the gun at his midsection. As the owner fled from the hotel, he heard additional gunshots. *Id*. 4–5.

By the time law enforcement arrived at the scene, Mr. Alvin had locked himself in one the hotel's unoccupied rooms. Law enforcement negotiators and S.W.A.T. officers attempted to convince Mr. Alvin to exit the room peacefully. During these talks, officers saw a gun lying on the floor of the room through a large window facing the front of the hotel. After several hours of negotiations, Mr. Alvin exited the hotel room without the gun and was arrested. Mr. Alvin was wearing a black and gold "G-shock" watch at the time his arrest. *Id*. at 5.

A crime scene investigator collected the gun from the room—a Taurus, Model PT111 G2, 9mm caliber pistol—and one fired casing from the hotel lobby floor. Inside the firearm was an additional fired casing, as well as one live round of ammunition. The live ammunition and casings found at the hotel were of the same type as the fired casing recovered at the B & J Market and the ammunition found during the search of Mr. Alvin's residence. A ballistics examiner later determined that the Taurus firearm possessed by Mr. Alvin at the hotel was the same gun used in the market robbery on April 3. *Id*.

The Second Superseding Indictment charges Mr. Alvin with conspiracy to commit Hobbs Act robbery (Count 1), substantive Hobbs Act robbery (Count 2), possession and discharge of a firearm during the commission of a crime of violence (Count 3), and possession of a firearm and ammunition by a convicted felon (Count 4), in violation of 18 U.S.C. §§ 1951(a), 924(c)(1)(A)(iii) and 922(g)(1) and 924(e) respectfully.[3]

## II. ANALYSIS

Defendant's pending motion seeks to prevent the Government's expert, Christopher Barr, from providing testimony that links the casing found that at the market robbery on April 3, 2022, with the casings and handgun recovered from Mr. Alvin immediately after the hotel robbery on May 8, 2022. Mr. Barr, a criminalist with the Miami-Date Police Department, examined this evidence and concludes in his expert opinion that the bullets fired at the market and hotel robberies were fired from the same handgun—the one in Mr. Alvin's possession on May 8. [D.E. 156 at 4].

According to Defendant, however, this testimony should be excluded because the Government cannot show that ballistics identification is a scientifically valid field, and/or because Mr. Barr's methodology falls short of *Daubert's* reliability threshold. Defendant first asks this Court for a wholesale exclusion of Mr. Barr's testimony. Alternatively, Defendant asks the Court to limit his testimony only to

---

[3] Similarly, the State of Florida has brought five charges against Mr. Alvin arising out of the hotel robbery: (1) attempted felony murder with a firearm, (2) robbery by sudden snatching, (3) armed robbery with a firearm, (4) possession of a firearm by a convicted felon, and (5) burglary of an unoccupied structure.

4

statements that the handgun cannot be ruled out as a potential source of the fired casings, but not that the casings were indeed fired from the handgun. Additionally, Mr. Alvin seeks an Order compelling the Government to acknowledge that the foundational validity of firearm analysis as a field has not been established. [D.E. 109 at 3].

Defendant primarily relies on two studies, the PCAST and NAS reports, that are critical of the methodology involved in toolmark matching/examination, and asserts that (1) the field is not subject to peer review; (2) the number of studies regarding rates of error is insufficient; (3) the examination process is impermissibly subjective; and (4) that there are not uniform standards governing examinations. [D.E. 109 at 11–12]. Altogether, Defendant essentially asks this Court to make an unprecedented finding in our circuit that ballistics identification, as a field, is not sufficiently reliable to pass muster under *Daubert*.

As we discuss in more detail below, this sweeping proposition is at odds with both Fed. R. Evid. 702 principles and the overwhelming weight of federal authority holding that ballistics experts are indeed permitted to testify as Rule 702 experts. Therefore, we are unpersuaded by the broad argument Defendant makes. The trier of judge is best positioned to consider some of Defendant's alternative arguments in terms of how this evidence is presented to the jury. At minimum, however, based on the evidence in this record the Government's ballistics expert's testimony should reflect that his conclusions are subject to a disputed rate of error, and thus incapable of conveying absolute scientific certainty. And Mr. Barr's testimony should be

5

presented in accordance with the directives of the DOJ's Uniform Language for Testimony and Reports ("ULTR") for the Forensic Firearms/Toolmarks disciplines. Thus, to this limited extent the pending motion can be **GRANTED in part**. Otherwise, however, it should be **DENIED**.

### A. *Governing Principles under Rule 702*

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert, v. Merrell Dow Pharm., Inc.*, 509 U.S. 589 (1993)). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Yet, in its role as a gatekeeper, the court's duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010); *City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted).

The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs, which "remain distinct concepts" such that "courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. And because exclusion of expert testimony is the "exception rather than the rule," Fed. R. Evid. 702 advisory committee's note, it is important to note that a "district court's gatekeeper role . . . 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence."

7

*Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

### B. *Mr. Barr's Testimony Satisfies* Daubert

As noted earlier, Defendant's challenge to the Government's expert focuses primarily on the reliability prong. Defendant calls into question the validity of the entire field of ballistics analysis, and claims that Mr. Barr's method and technique for ballistics examination (*i.e.*, the Association of Firearm and Tool Mark (the "AFTE method")) is unreliable. Yet, neither the record nor any of the testimony adduced at the hearing, convince us that Mr. Barr's testimony based on the field of ballistics analysis is so invalid or unreliable, such that it cannot withstand *Daubert* scrutiny. To the contrary, and consistent with virtually every federal court that has addressed the admissibility of ballistics experts under Rule 702, we find that the Government has successfully met its burden in demonstrating the reliability of Mr. Barr's testimony.

As a threshold matter, we are unpersuaded that any of the evidence proffered by the Defendant—including the PCAST and NAS reports—sufficiently undermines the foundational validity of the ballistics analysis field to the extent of rendering the entire practice inadmissible for *Daubert* purposes. Defendant has certainly made a good case that this testimony should not be taken as gospel and is subject to

8

challenge. But even in that case, the government need not show that expert testimony is infallible to an absolute or near absolute certainty in order to present it to the trier of fact. *See, e.g., Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096149, at *4 (S.D. Fla. Dec. 20, 2011) ("[a]n expert's method need not be perfect, nor need he apply it perfectly"); *Bacho v. Rough Country, LLC*, 2016 WL 4607880, at *5 (N.D. Ga. Mar. 17, 2016) ("[t]he methodology need only be sufficiently reliable under *Daubert*, not infallible." (*citing Quiet Tech.*, 326 F.3d at 1340–41).

Although the 2016 PCAST report (which cites to the older NAS report) is critical of certain aspects of ballistics analysis, nowhere in this report does one find the categorical conclusion that Defendant seems to extrapolate from it: that ballistics analysis is a pseudo-science unfit for judicial proceedings. Indeed, the report itself contemplates admission of this type of testimony in court, provided that the error rate of its black-box study is reported. *See* PCAST Report at 12. In this sense, we echo Judge Seitz's observation that Defendant "appears to overstate the PCAST Report's conclusions," because the "Report falls short of stating that the field of ballistics identification is invalid or unreliable." *United States v. Miller*, No. 21-cr-20323-SEITZ, [D.E. 62 at 9–10] (S.D. Fla. Apr. 8, 2022) (denying motion to exclude ballistics expert on identical unreliability challenge and noting that: the PCAST Report suggests that better training could lower error rates; and that studies postdating the PCAST Report addressed its critiques and established that ballistics identification can be tested for reliability). Nothing in the record leads us to conclude otherwise. We turn to some specific challenges and reliability factors to draw our conclusions.

9

### *1.    Testing and Peer Review*

We first conclude that the Government has met its burden of showing that the proffered testimony has been sufficiently tested and peer reviewed to satisfy *Daubert*. Substantial evidence was introduced in this record to hold that Mr. Barr's methodology has been sufficiently tested and exposed to peer review. As the Government points out, Mr. Barr's ballistic analysis method has been tested by the Miami-Dade County crime laboratory and the Ames Laboratory Study, both of which suggest that the AFTE method is reproducible and testable. [D.E. 122 at 4–6]. Mr. Barr testified at the hearing that he also can point to several other similar studies involving different types of firearms and conducted at various times, before and after the PCAST report, that bolster his conclusions.

Notwithstanding Defendant's arguments to the contrary, the Court finds such testimony and the supporting materials cited by the expert as adequate to find that this field of study is sufficiently reliable. As Judge Seitz put it in reaching a similar conclusion, "[t]he experts' conclusions can be challenged in some objective sense and are not instead simply a subjective, conclusory approach that cannot be reasonably assessed for reliability. Specific observations supporting an expert's opinion can be thoroughly critiqued on cross-examination." *Miller*, No. 21-cr-20323-SEITZ at 10 (quotes and citation omitted).

Likewise, the Government has made a sufficient showing that the AFTE methodology has been peer-reviewed, not just by AFTE's own journals but also by additional scientific literature that postdates the PCAST and NAS reports. [D.E. 122

at 5–6].[4]  Indeed, several federal courts have found that the publication in the AFTE Journal alone meets *Daubert*'s requirements.  *See United States v. Ashburn*, 88 F. Supp. 3d 239, 245–46 (E.D.N.Y. 2015) (finding that the AFTE method has been subjected to peer review through the AFTE Journal); *United States v. Otero*, 849 F. Supp. 2d 425, 433 (D.N.J. 2012) (describing the AFTE Journal's peer reviewing process and finding that the methodology has been subjected to peer review); *United States v. Taylor*, 663 F. Supp. 2d 1170, 1176 (D.N.M. 2009) (finding that the AFTE method has been subjected to peer review through the AFTE Journal and two articles submitted by the government in a peer-reviewed journal about the methodology); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366–67 (D. Mass. 2006) (describing the AFTE Journal's peer reviewing process and finding that it meets the *Daubert* peer review element).

Defendant's arguments that these tests and studies are themselves subject to challenge are well taken.  But even if we agree with much of what Defendant highlights, those are ultimately factual challenges that go to the weight of the analysis.  We clearly cannot reach a conclusion as a matter of determinative law that the weaknesses in the studies render them per se invalid.  For instance, how one treats "inconclusive" results in those studies (i.e. whether they can simply be excluded in measuring the error rate as the proponents argue, or whether instead each such result constitutes an error that should be counted as such) is a matter that experts

---

[4] The peer review factor "[is] a relevant, though not dispositive, consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786.

can disagree about. In short, critics of this type of testimony argue that the studies citing less than five percent error rates are skewed and misleading because inconclusive results are not treated as errors. But that dispute clearly prompts, at best, cross-examination and rebuttal expert testimony. It does not compel wholesale exclusion of the entire field of analysis, which is supported by several studies and testing methodologies that conclude that the rate of error by trained analysts is substantially less than five percent. One need only look at the PCAST report itself for evidence of such a study and implied recognition by even critics of this testimony that there is a scientific basis for ballistics analysis.

Consequently, the Government has presented enough evidence supporting a prima facie finding of reliability for the expert's analysis based on adequate scientific testing and peer review.

### 2. *Rate of Error*

Based on the available record and the Government's evidence presented at the hearing, this element is also satisfied. As the Government's response makes clear, studies of the AFTE method have reported articulable and testable error rates of "less than 1.2% and the false positive rate at "1.52%" respectively." [D.E. 122 at 6]. Further, Defendant himself concedes that the PCAST report has reported error rates that, despite deviating from the AFTE's findings, continue to constitute a low number in practical terms. *See* [D.E. 109 at 17]. And a cursory survey of recent federal rulings considering this same question makes clear that AFTE method has been subjected to post-PCAST studies that have consistently reported low false positive rates of error. *See United States v. Harris,* 502 F. Supp. 3d 28, 39 (D.D.C. 2020)

12

(admitting ballistics expert and discussing "nineteen toolmark validation studies conducted between 1998 and 2019, of which eleven studies had a false positive error rate of zero percent, and the highest false positive error rate calculated was 1.6%"); *Miller*, No. 21-cr-20323-SEITZ at 11 ("[p]ost-PCAST studies reveal error rates significantly lower [than those reported in the PCAST Report]").  Thus, the Government has met its burden to show that the AFTE method has a rate or a potential rate of error that is sufficiently low to satisfy *Daubert*.  *See United States v. Johnson*, 2019 WL 1130258, at *19 (S.D.N.Y. Mar. 11, 2019), *aff'd*, 861 F. App'x 483 (2d Cir. 2021) ("even accepting the PCAST Report's assertion that the error rate could be as high as 1 in 46, or close to 2.2%, such an error rate is not impermissibly high").

Again, Defendant's challenges to the error rate calculation (discussed above) may warrant review by the trier of fact.  But those challenges do not persuade us that the field of study is simply unreliable.  To the contrary, the fact that inconclusive results are excluded in the error rate analysis seems quite sound and consistent with the scientific method.  Given that, the record presented on this motion amply supports a prima facie finding that ballistics analysis has been adequately tested and measured for error rates to assure a sufficient level of reliability.

### 3. *Controlling Standards and Degree of Acceptance*

The absence of controlling standards dictating the conclusions of the AFTE method is the only *Daubert* factor that weighs against admissibility of the expert testimony in this case, as the Government (and its expert) does not seriously dispute that ballistics analysis inherently entails the application of subjective judgment calls by the examiner.  However, we agree with the Government that the presence of

subjectivity in the execution of ballistics identification is not enough to render the method unfit for *Daubert* purposes.

The subjectivity involved in ballistics analysis is not of the kind that is completely detached from reality. Instead, the subjective assessments made when determining a match between two bullet casings or when linking them to a particular handgun are based on empirical observations of physical traits that are measurable and reproducible for objective inspection. In this context, while in part subjective, a ballistics expert's conclusions rest upon articulate observations and are grounded in tangible physical evidence, which can be subject to challenge through cross-examination in court. This case is no exception, as Mr. Barr documented "in detail, through note-taking and photographs, the basis for his findings," and shared these materials with Defendant. [D.E. 122 at 5].

As the Eleventh Circuit has held in other *Daubert* contexts, the existence of some degree of subjectivity is not fatal to the reliability of an otherwise sound methodology. *See United States v. Hood*, 846 F. App'x 825, 829 (11th Cir. 2021) ("the district court acted in accordance with our caselaw and the decisions of other circuits that have upheld such evidence as reliable under *Daubert*, notwithstanding the subjective nature of the ACE-V method"); *see also Harris*, 502 F. Supp. at 42 ("a partially subjective methodology is not inherently unreliable, or an immediate bar to admissibility"). Thus, we are not convinced that the degree of subjectivity inherent in ballistics identification renders the practice inadmissible under *Daubert*.

This conclusion is strengthened when one considers that the methods and techniques for ballistics analysis employed by Mr. Barr in this case enjoy widespread acceptance in the relevant forensic community. *See Harris*, 502 F. Supp. at 42 ("firearm and toolmark identification is practiced by accredited laboratories in the United States and throughout the world, including England (Scotland Yard), New Zealand, Canada, South Africa, Australia, Germany, Sweden, Greece, Turkey, China, Mexico, Singapore, Malaysia, Belgium, Netherlands, and Denmark").

In sum, after balancing all the *Daubert* factors relevant to this reliability determination, we find that the Government has met its burden. Thus, Defendant's motion for exclusion should be **DENIED**, and Mr. Barr should be allowed to offer expert testimony at Mr. Alvin's trial.

### C. *Mr. Barr's Testimony Should be Limited*

On the other hand, Defendant's argument that Mr. Barr's testimony should be limited to reflect that his conclusions in this case are subject to a rate of error and, thus, cannot denote absolute certainty, is well taken.

That being said, the limitations that Defendant moves this court to impose upon Mr. Barr are too extreme and unwarranted. Basically, Defendant asks that this court to endorse the findings made by the PCAST Report in 2016 and to force Mr. Barr to adopt those findings, particularly with respect to the rate of error for false positives reported in the black-box study. While Defendant himself is free to continue to rely in those findings and to confront Mr. Barr with their significance on the witness stand, we find no basis to force the Government's expert to adopt the PCAST

15

findings; experts are free to choose the literature upon which they wish to rely in forming their expert conclusions.

Instead, and consistent with the limitations that recent federal rulings addressing this same issue have endorsed, we recommend that Mr. Barr's testimony be tethered to the directives of the DOJ's ULTR for the forensic toolmarks and firearms disciples. *See Miller*, No. 21-cr-20323-SEITZ at 13 ("The Court finds limiting expert testimony language consistent with the DOJ ULTR appropriate in this case"); *Harris*, 502 F. Supp. at 45 ("the Court instructs Mr. Monturo to abide by the expert testimony limitations detailed in the DOJ ULTR."). By doing so, the expert's testimony cannot be presented as absolute scientific certainty, and he must acknowledge and explain to the jury the significance of rates of error in the field of ballistics analysis.

Beyond this, any further limitations on his testimony are best presented to the trial judge at the time the expert's testimony is presented to the jury. The pending motion should thus be **GRANTED** in limited part.

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to exclude ballistics evidence [D.E. 109] be **DENIED** subject to the limitations addressed above that warrant the motion being **GRANTED** in limited part.

Pursuant to Local Magistrate Rule 4(b), good cause exists to expedite a response. The parties have until **January 10, 2024, by noon,** to file written objections, if any, with the District Judge. Failure to timely file objections shall bar

16

the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g.*, *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 5th day of January, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge